JUDGE SCHEINDLIN

14 CV 3601

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

Case No.

FLIGHT TRAINING FINANCE, LLC,

v.

AVIATION HOLDINGS I, LP;

    defendants.

_____/



## COMPLAINT FOR DAMAGES

    Flight Training Finance, LLC, sues defendant Aviation Holdings I, LP, for breach of contract, anticipatory breach of contract, breach of the covenant of good faith and fair dealing, account stated, and unjust enrichment.

## PARTIES

    1.    Flight Training Finance, LLC ("FTF") is a Florida limited liability company.

    2.    Defendant, Aviation Holdings I, LP ("Aviation Holdings"), is a citizen of the Cayman Islands. Aviation Holdings is either a wholly owned subsidiary of BlackRock Investment Management, LLC ("BlackRock"), or BlackRock owns a controlling share of Aviation Holdings. BlackRock is a citizen of New York.

## JURISDICTION & VENUE

    3.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332 because (1) this is an action for damages in excess of $75,000, exclusive of interest and costs, and (2) there is complete diversity of citizenship between FTF and Aviation Holdings.

4.     This Court has personal jurisdiction over defendant under the Servicing Agreement between FTF and defendant, which is at issue in this action. *See* Exhibit A. Specifically, Section 9.9 of that agreement provides for jurisdiction in the United States District Court for the Southern District of New York:

> The servicing Agreement is being delivered in and shall be governed by and construed and enforced in accordance with the laws of the State of New York, without giving effect to conflict of laws principles thereof. The parties hereby consent to the sole and exclusive jurisdiction of the courts of the State of New York located in New York County or the United States District Court for the Southern District of New York, for purposes of any action or proceeding brought on or in connection with this Servicing Agreement or any alleged breach thereof.

5.     This Court also has jurisdiction over defendant because it negotiated and signed the Servicing Agreement in New York.

6.     This Court is the proper venue under 28 U.S.C. § 1391 because defendant resides in this District and because it consented to venue in this District under Section 9.9 of the agreement at issue. *See* Exhibit A.

## GENERAL ALLEGATIONS

7.     FTF has extensive expertise in the flight simulator industry.

8.     FTF has been managing portfolios of flight simulators for third parties since its creation in 2003. In addition to managing portfolios, FTF also assists in the selection and purchase of simulators for third parties who charge airlines an hourly fee for training their pilots to fly a particular aircraft depending on the airline's need. In essence, the third party merely finances the portfolio and FTF runs the business.

9.     In or around February 2006, FTF, in conjunction with other investors, created Flight Training Finance Investment Partners, LLC ("FTFIP"), to own a portfolio of simulators which FTF was to manage.

10.     In or around January, 2010, FTF and BlackRock began conversations that would lead BlackRock to start a business relationship with FTF.

11.     Thereafter, BlackRock created Aviation Holdings to own and operate flight simulators.

12.     On or about October 7, 2010, Aviation Holdings purchased four commercial full-flight training simulators from FTFIP (the "Original Simulators"). The Original Simulators are identified as the B757 FFS, the ERJ 145, the B737NG, and the EMB 170.

13.     Given FTF's industry expertise and FTF's prior management of the Original Simulators under FTFIP, Aviation Holdings and FTF entered into an oral contract to manage the Original Simulators and any other simulators that Aviation Holdings subsequently acquired. Although FTF continually pushed for a written contract, Aviation Holdings and FTF operated without one for almost two years. Finally, on March 16, 2012, FTF and Aviation Holdings reduced their oral contract to a writing in the Servicing Agreement (the "Agreement") attached as Exhibit A, which has an effective date of November 23, 2010. The parties' entire business relationship was governed by the Agreement.

14.     Between October 7, 2010 and March 16, 2012, Aviation Holdings purchased three additional full-flight training simulators that were to be located in

Toluca, Mexico (the "Toluca Simulators"). The Toluca Simulators are identified as the A320 FFS, the Bell 412, and the Lear 45.

15.    Under the Agreement, FTF became the manager of the Toluca Simulators.

16.    Thereafter, Aviation Holdings acquired three additional simulators, identified as the A330, B737-300, and the B737NG (the "New Simulators").

17.    Under the Agreement, FTF became the manager of the New Simulators.

18.    Under the Agreement, Aviation Holdings is obligated to compensate FTF, generally, by paying (i) an "Origination Fee" for any new simulators added to Aviation Holdings' portfolio and (ii) a "Monthly Fee," consisting of a percentage of the gross revenues generated by any simulators owned or operated by Aviation Holdings, including the Original Simulators, the Toluca Simulators, and the New Simulators.

*Origination Fees*:

19.    Under Section 4.2.3 of the Agreement, Aviation Holdings agreed to pay FTF an Origination Fee equal to one and one-half percent (1.50%) of the purchase price for all deals with a guaranteed number of hours of training, and one percent (1.00%) of the purchase price for all revenue-share deals, for any new simulators added to Aviation Holdings' portfolio.

20.    Aviation Holdings owes this Origination Fee to FTF regardless of whether or not FTF is involved in, provides the contact for, or consummates the deal that brings a new simulator to Aviation Holdings' portfolio.

21.    In or around the Fall of 2012, FTF coordinated a transaction between Aviation Holdings and CAE that resulted in the B737NG being added to Aviation Holdings' portfolio. Aviation Holdings owes FTF approximately $96,000 for the

Origination Fee for the acquisition of the B737NG which amount remains outstanding despite demand.

22.     Under Section 4.2.2 of the Agreement, Aviation Holdings owes FTF $107,276.20 as an Origination Fee for the Bell 412 and the Lear 45 simulators, which remains outstanding despite demand.

23.     Accordingly, Aviation Holdings owes FTF a total of $203,276.20 in Origination Fees.

24.     For FTF to accurately invoice Aviation Holdings for Origination Fees, it must learn the terms (e.g., whether the agreement is on a revenue sharing or a guaranteed hourly basis) of any new deals to add simulators to Aviation Holdings' portfolio.

25.     FTF has found and developed all of the clients and suppliers for the portfolio. But Aviation Holdings has gone behind FTF, negotiating simulator transactions under a veil of secrecy, in order to freeze FTF out of the information it needs to invoice Aviation Holdings for Origination Fees and Monthly Fees.

26.     On information and belief, Aviation Holdings' purpose in freezing FTF out from information on new deals is to prevent FTF from collecting the Origination and Monthly Fees provided for in the Agreement.

*Monthly Fees*:

27.     Aviation Holdings is obligated to pay FTF a percentage of the revenue generated by the simulators in Aviation Holdings' portfolio as Monthly Fees. *See* Exhibit A.

28.     Aviation Holdings owes FTF $11,939.47 in Monthly Fees for the Original Simulators, which amount has been duly invoiced and remains outstanding despite demand.

29.     Aviation Holdings owes FTF $31,990.00 in Monthly Fees for the A 320 Toluca Simulator, which amount has been duly invoiced and remains outstanding despite demand.

30.     Aviation Holdings owes FTF $98,779.38 in Monthly Fees for the Bell 412 and the Lear 45 Toluca Simulators, which amount has been duly invoiced and remains outstanding despite demand.

31.     Aviation Holdings owes FTF $25,485.61 in Monthly Fees for the A330 and the B737-300 New Simulators, which amount has been duly invoiced and remains outstanding despite demand.

32.     Aviation Holdings owes FTF approximately $48,342.66 in Monthly Fees for the B737NG, one of the New Simulators. To date, and despite numerous requests by FTF, Aviation Holdings refuses to disclose to FTF the information that it needs to calculate the Monthly Fees owed on the B737NG. However, on information and belief, 4,092.50 flight training hours have been logged on the B737NG since it has been in Aviation Holdings' portfolio. That amount of usage obligates Aviation Holdings to pay FTF approximately $48,342.66 in Monthly Fees.

33.     Thus, Aviation Holdings owes FTF $216,537.12 in Monthly Fees for services rendered through February 2014.

34.     Aviation Holdings also owes FTF $10,015.90 in Monthly Fees for the month of March, 2014.

35.     Accordingly, Aviation Holdings owes FTF a total of $226,553.02 in Monthly Fees.

*Expenses*:

36.     Under Section 5.2 of the Agreement, Aviation Holdings agreed to pay or reimburse FTF for expenses incurred in the performance of FTF's duties under the Agreement.

37.     Aviation Holdings has failed to reimburse FTF for expenses incurred in the performance of FTF's duties under the Agreement on 23 outstanding expense invoices, which total $36,712.19.

38.     Thus, Aviation Holdings owes FTF a total of $466,541.41 in Monthly Fees, Origination Fees, and Expenses incurred through March 2014.

*For Cause Termination*:

39.     On or about March 28, 2014, Aviation Holdings notified FTF that it was terminating the Agreement, purportedly for cause, citing to a business dispute with Concesionaria Vuela Compañía de Aviación, S.A. de C.V. (operating as "Volaris"), an airline that used the Toluca Simulators to train its pilots. In fact, any problems in the business relationship between Aviation Holdings, FTF, and Volaris were attributable to Aviation Holdings.

40.     On information and belief, it was Aviation Holdings' intent to rekindle its relationship with Volaris once FTF was out of the picture, in order to eliminate FTF's five percent (5%) management fee from Aviation Holdings' balance sheet. Coincidentally, today Volaris is doing as much volume of business with Aviation Holdings as before.

41. Section 5.5 of the Agreement provides that Aviation Holdings and FTF may terminate the Agreement for Cause, as defined within this section, and sets forth five separate "for Cause" grounds. The Agreement may not be terminated unless one of the five "for Cause" grounds is met. Here, none of FTF's actions give Aviation Holdings the right to terminate for Cause.

42. Nothing in the Agreement imposes a penalty on FTF if the Agreement is terminated for Cause.

43. To the contrary, Section 5.6 of the Agreement clearly states that FTF is entitled to all outstanding payments at the time of termination, which as shown above, total at least $466,541.41.

44. Because Aviation Holdings has no grounds for a "for Cause" termination of the Agreement, Aviation Holdings owes FTF approximately $1,000,000.00 for the Monthly Fees due on long term contract payments due from April 1, 2014, through the Agreement's term of November 2015. Moreover, Aviation Holdings will owe FTF an Origination Fee for any deals consummated through November 2015.

## COUNT I – BREACH OF CONTRACT

45. FTF realleges paragraphs 1 through 44 of the Complaint as though fully set forth in this Count.

46. FTF and defendant entered into a valid and binding agreement effective on November 23, 2010.

47. FTF has performed all of its obligations under the Agreement by providing to defendant the Services contemplated under the Agreement.

8

48.     Defendant has materially breached the Agreement by failing to pay FTF amounts due and owed under the Agreement for Monthly Fees, Origination Fees, and Expenses.

49.     As a result of defendant's material breach of the Agreement, FTF has suffered and continues to suffer damages – the full extent of which will be determined at trial – of no less than $1.4 Million.

50.     WHEREFORE, FTF demands judgment in its favor and against Aviation Holdings awarding damages, prejudgment interest, and costs and such other relief as this Court deems appropriate.

## COUNT II – ANTICIPATORY BREACH OF CONTRACT

51.     FTF realleges paragraphs 1 through 44 of the Complaint as though fully set forth in this Count.

52.     Aviation Holdings repudiated its duties under the Agreement, which would have continued through November 2015, by terminating the Agreement for Cause under false pretenses, prior to November 2015.

53.     Aviation Holdings' performance of paying FTF under the Agreement through November 2015 is dependent on FTF providing the Services under the Agreement through November 2015.

54.     As a result of defendant's anticipatory repudiation, which constitutes a material breach of the Agreement, FTF will suffer damages – the full extent of which will be determined at trial – of approximately $1 Million. Aviation Holdings will also owe FTF an Origination Fee for any deals consummated through November 2015.

55.    WHEREFORE, FTF demands judgment in its favor and against Aviation Holdings awarding damages, prejudgment interest, and costs and such other relief as this Court deems appropriate.

## COUNT III – BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

56.    FTF realleges paragraphs 1 through 44 of the Complaint as though fully set forth in this Count.

57.    Defendant agreed to abide by the terms of the Agreement. Implied in the Agreement was defendant's covenant to act in good faith and deal fairly.

58.    Defendants' actions, as set forth above, breached the implied covenant of good faith and fair dealing by actions which include, but are not limited to, failing to pay invoices when due, preventing FTF from being able to accurately invoice Origination Fees and Monthly fees, and terminating the Agreement for Cause under false pretenses.

59.    Defendants' breach has caused substantial harm and damage to FTF.

60.    As a result of defendant's breach of the covenant, FTF has suffered significant damages – the full extent of which will be determined at trial – of no less than $1.4 Million.

61.    WHEREFORE, FTF demands judgment in its favor and against Aviation Holdings awarding damages, prejudgment interest, and costs and such other relief as this Court deems appropriate.

## COUNT IV – ACCOUNT STATED

62.     FTF realleges paragraphs 1 through 44 of the Complaint as though fully set forth in this Count.

63.     A debtor-creditor relationship existed between FTF and Aviation Holdings by virtue of the outstanding invoices and amounts owed by Aviation Holdings to FTF for Origination Fees, Monthly Fees, and Expenses.

64.     The parties examined and are aware of the outstanding invoices for Origination Fees, Monthly Fees, and Expenses.

65.     A balance has been struck under the Agreement for the amount Aviation Holdings owes FTF for Origination Fees, Monthly Fees, and Expenses.

66.     Aviation Holdings agreed to pay the outstanding amount owed for Origination Fees, Monthly Fees, and Expenses yet refuses to make payment.

67.     WHEREFORE, FTF demands judgment in its favor and against Aviation Holdings awarding damages, prejudgment interest, and costs and such other relief as this Court deems appropriate.

## COUNT V – UNJUST ENRICHMENT

68.     FTF realleges paragraphs 1 through 44 of the Complaint as though fully set forth in this Count.

69.     In the alternative, if this Court were to find there is no valid enforceable contract, FTF provided defendant with valuable consulting, marketing, business development, and management services. As stated above, FTF, managed defendant's portfolio of simulators for over 3 years and Aviation Holdings has received the approximate amount of $27,100,000.00 in cash from the Assets governed by the

Agreement. Such management services included: managing the day-to-day operations of the simulators; generating new customers for existing simulator leases or training agreements and evaluating new simulator lease customer opportunities including the preparation of financial models; maintaining documentation for purchases, leases, and related agreements; assisting Aviation Holdings in contract compliance; providing a monthly status report of training forecasted on each simulator and any potential third-party use; providing Aviation Holdings with monthly utilization reports; creating invoices for each lessee and maintaining files with utilization and billing details for each simulator and counterparty; and overseeing and supervising simulator maintenance and upgrades, aviation authority evaluations, and aviation authority competence.

70. Defendant benefitted from the services provided by FTF and is legally or equitably obligated to pay for said services.

71. Defendant has refused to pay FTF for its services despite numerous demands to do so.

72. As a result, defendant has been unjustly enriched at the expense of FTF, and FTF has been damaged in an amount to be determined at trial, but not less than $1.4 Million.

73. It would be unjust and inequitable to allow defendant to retain the benefits of FTF's services without compensating FTF.

74. WHEREFORE, FTF demands judgment in its favor and against Aviation Holdings awarding damages, prejudgment interest, and costs and such other relief as this Court deems appropriate.

## DEMAND FOR JURY TRIAL

FTF requests a jury trial on all issues so triable.

Dated: May 12, 2014

Respectfully submitted,

RIVERO MESTRE LLP
*Attorneys for Flight Training Finance, LLC*
2525 Ponce de Leon Boulevard
Suite 1000
Miami, Florida 33134
Telephone:  (305) 445-2500
Fax: (305) 445-2505
E-Mail: jmestre@riveromestre.com

By: 

JORGE A. MESTRE
N.Y. Bar No. 4977450
S.D.N.Y. Bar No. JM4977

13

# <u>Exhibit A</u>

EXECUTION VERSION

## SERVICING AGREEMENT

**THIS SERVICING AGREEMENT** is dated as of March 16, 2012 (the "**Servicing Agreement**") and is entered into by and between Aviation Holdings I, LP (the "**Company**"), and Flight Training Finance, LLC ("**FTF**"). The Company and FTF shall hereafter be individually referred to as a "**Party**" and collectively as the "**Parties**".

**WHEREAS**, pursuant to that certain Purchase Agreement between, the Company and Flight Training Finance Investment Partners, LLC dated as of October 7, 2010 (the "**Stock Purchase Agreement**"), the Company, through its subsidiaries, owns four (4) commercial aircraft full-flight training simulators which are currently subject to operating leases with various operators, including airlines and manufacturers (the "**Original Simulators**");

**WHEREAS**, the Company, through its subsidiaries, owns three (3) full-flight training simulators which are currently located at the CAE Training Center in Toluca, Mexico (the "**Toluca Simulators**");

**WHEREAS**, the Company desires to acquire additional flight simulators and other related assets which are or may be subject to operating leases or training agreements (the "**New Simulators**");

**WHEREAS**, FTF has prior experience with owning and leasing full-flight training simulators and a working knowledge and expertise in flight training;

**WHEREAS**, the Company desires to obtain the consulting services of FTF, and FTF is willing to be engaged by the Company to provide management services in respect of the Original Simulators and the New Simulators, when and if acquired, as an independent contractor upon the terms and conditions set forth herein;

**NOW, THEREFORE**, the parties hereto agree as follows:

1.    **Engagement.** The Company hereby engages FTF, and FTF hereby accepts such engagement, to provide to the Company, the Services on the terms and conditions set forth in this Servicing Agreement, as an independent contractor. In this Servicing Agreement, the Original Simulators, the Toluca Simulators and the New Simulators, when and if acquired, shall be collectively referred to as the "**Assets**" or each simulator individually as an "**Asset**".

2.    **Term.** The period for which FTF shall provide the Services to the Company will be for a term of five (5) years commencing on November 23, 2010 (the "**Effective Date**") and terminating on the earlier of (a) the sixtieth (60) month anniversary of the Effective Date and (b) such time as the Servicing Agreement between FTF and the Company is terminated in accordance with Section 5.5 or 5.8 of this

1

EXECUTION VERSION

Servicing Agreement (the period during which FTF provides Services hereunder being hereinafter referred to as the "**Servicing Period**").

3. **Services.** It is understood and agreed by FTF that the Services are to be rendered by Pedro Sors, John Pincavage and Elsa Gagnon (the "**Individuals**").

3.1 During the Servicing Period, FTF shall be responsible for the performance of the following duties (collectively, the "**Services**"):

3.1.1 manage the day-to-day operations of the Assets subject to the supervision and control of the Company;

3.1.2 maintain for the Company complete and accurate files and documentation associated with New Simulator purchases, leases and related agreements;

3.1.3 assist the Company in fulfilling the duties of asset and contract compliance;

3.1.4 provide a monthly status report of sales leads and developments to the Company;

3.1.5 provide a monthly status report of training forecasted on each Sim and any potential third party use;

3.1.6 provide the Company with monthly utilization reports;

3.1.7 create invoices for each lessee and maintain files with utilization and billing details for each Asset and counterparty;

3.1.8 generate new customers for existing simulator leases or training agreements and evaluate new simulator lease customer opportunities including the preparation of financial models;

3.1.9 generate and evaluate new simulator purchase opportunities including the preparation of financial models;

3.1.10 oversee the manufacturing and administration process for any New Simulator orders direct from the manufacturer;

3.1.11 assist the Company in negotiations and preparing legal documentation related to the simulator, the lease and associated agreements;

3.1.12 supervise Asset sales, marketing and customer service as requested by the Company;

3.1.13 oversee and supervise Asset maintenance and upgrades, aviation authority evaluations, aviation authority competence;

3.1.14 report directly to the Company on a timely basis any information which is received from the user (lessee) of the Assets or relating to the performance of any of the Assets;

3.1.15 attend meetings with the Company as often as the Company sees fit; and

3.1.16 assist the Company with any and all other duties reasonably assigned to FTF from time to time by the Company.

3.2    The Individuals shall devote substantially all of their business time, attention, skills and efforts to the performance of the Services provided for hereunder, and in all events as necessary to perform their duties hereunder. The time, place and manner of the delivery of the Services shall be as reasonably necessary and appropriate to the fulfillment of the various tasks FTF is assigned from time to time, as may be necessary to manage the day-to-day operations of the Assets.

4.    **Compensation**.

4.1    As consideration for the provision of the Services, FTF will be entitled to receive a monthly fee (the "**Monthly Fee**") to be paid in arrears as follows:

4.1.1 For the Original Simulators, (i) from the Effective Date through September 30, 2011, an amount equal to $9,375 per Original Simulator, and (ii) from October 1, 2011 and thereafter in an amount equal to five percent (5.0%) of the gross revenues for that month received by the Company from the Original Simulators, to be paid such that FTF will invoice to the Company the amount of $20,000 per month for the Original Simulators which will be paid to FTF promptly upon receipt of an invoice from FTF at month end. Once utilization reports have been received on all Original Simulators, a comparison will be made between the amount of the Monthly Fee already paid to FTF and 5.0% of the gross revenues to be received by the Company from the Original Simulators. If the amount of $20,000 already paid exceeds 5.0% of the gross revenues to be received by the Company from the Original Simulators, the adjustment will be made in the advance payment of the subsequent month. If the Monthly Fee already paid to FTF is less than 5.0% of the gross revenues to be received by the Company from the Original Simulators, the additional payment will be made to FTF upon (a) receipt of an invoice from FTF and

3

(b) after the Company is in receipt of all current rental amounts from the lessees of the Original Simulators.  For the avoidance of doubt, the aggregate annual Monthly Fees paid pursuant to 4.1.1(ii) shall in no event exceed 20.0% of the aggregate annual Net Revenues received by the Company from the Original Simulators. For purposes of this Agreement, "**Net Revenues**" shall refer to the amounts calculated from gross revenues received by the Company from each simulator less expenses (including but not limited to housing and maintenance fees and expenses, management fees, travel and expenses, and debt servicing principal and interest).

4.1.2   For the A320 full flight simulator located at CAE's training facility in Toluca, Mexico, FTF will be entitled to receive an amount equal to five percent (5.0%) of the gross revenues generated by the simulator.  Such amount will be paid promptly to FTF following receipt by the Company of (i) the monthly amount due for use of the A320 full flight simulator and (ii) an invoice from FTF.  For the avoidance of doubt, the aggregate annual Monthly Fees paid pursuant to 4.1.2 shall in no event exceed 20.0% of the aggregate annual Net Revenues on the A320 full flight simulator.

4.1.3   For the Bell 412 full flight simulator and the Lear 45 full flight simulator, both located at CAE's training facility in Toluca, Mexico, FTF will be entitled to receive (i) for as long as Advanced Monthly Fees (as defined below) remain outstanding, ten percent (10.0%) of the revenues received by FTFIP Ireland III Limited and (ii) beginning on the date that the remaining Advanced Monthly Fees (as defined below) have been repaid to the Company in full, five percent (5.0%) of the revenues received by FTFIP Ireland III Limited.   For the avoidance of doubt, the aggregate annual Monthly Fees paid pursuant to 4.1.3 shall in no event exceed 20.0% of the aggregate annual Net Revenues on the Bell 412 full flight simulator and the Lear 45 full flight simulator.

4.1.4   For additional New Simulators, the Monthly Fee shall be calculated as 5.0% of gross revenues received by the Company from each New Simulator, provided that the Monthly Fees paid to FTF shall in no event exceed 20.0% of the aggregate annual Net Revenues on each New Simulator.

4.2      During the Servicing Period, in addition to the Monthly Fee as described above, FTF shall be eligible to receive an origination fee for Assets purchased by the Company when the acquisition and/or deployment is facilitated by FTF ("**Origination Fee**").   This Origination Fee shall be due and payable on the date that the Asset is (a) certified ready for training and (b) operating under a lease or training agreement.

4.2.1   For the A320 full flight simulator located at CAE's training facility in Toluca, Mexico, FTF will be entitled to receive the amount of $48,150.00 which is equal to 1.5% of the purchase price paid for the acquisition of the Asset, payable upon the execution of this Servicing Agreement.

4.2.2   For the Bell 412 full flight simulator and the Lear 45 full flight simulator, both located at CAE's training facility in Toluca, Mexico, FTF will be entitled to receive (i) $93,470.00 which equates to one-half percent (0.5%) of the purchase price paid for the acquisition of the Bell 412 and the Lear 45, payable upon the execution of this Servicing Agreement and (ii) after the Company has received a minimum hurdle return of 8% from the revenues received by FTFIP Ireland III Limited, FTF will be entitled to receive an additional amount equal to five percent (5.0%) of the amount of the revenues received by FTFIP Ireland III Limited until the earlier of (A) FTF having received the amount of $140,205.00 pursuant to this section 4.2.2(ii) and (B) January 1, 2014.

4.2.3   For additional New Simulators, the Company agrees to pay FTF an Origination Fee which shall be in an amount determined according to each transaction consummated, provided however, that (i) for all operating lease deals with guaranteed hours, the Origination Fee shall be an amount equal to one and one-half percent (1.50%) of the purchase price paid for the acquisition of such simulator(s) and (ii) for all revenue share deals, the Origination Fee shall be an amount not less than one percent (1.00%) of the purchase price paid for the acquisition of such simulator(s), subject to negotiation between FTF and the Company.

4.3   The Parties hereto agree that as of September 30, 2011, (a) FTF had received from the Company the total amount of $385,000.00 pursuant to Section 4.1.1(i) above, (b) 5.0% of the gross revenues generated by the Original Simulators for the benefit of the Company equated to $196,145.08, and (c) FTF received an excess amount equal to $188,854.92 ("**Advanced Monthly Fees**"). Therefore, in order for FTF to reimburse the Company for the Advanced Monthly Fees paid to FTF as of September 30, 2011, the Parties hereto agree that FTF shall (x) forfeit its right to receive the Origination Fee of $93,470.00 as described in Section 4.2.2(i) above, and (y) forfeit its right to receive payment of 50% of the Monthly Fee on the Bell 412 and the Lear 45 until 50% of the 10% as described in Section 4.1.3(i) above, equals the sum of $95,384.92.  Following the repayment of the Advanced Monthly Fees as described herein, FTF shall be eligible to receive from the Company all fees owed and due in full without any further discount or credit.

5

4.4     In the event of a sale of any Asset(s) of the Company, as defined herein, to a third-party purchaser introduced to the Company by FTF, the Company agrees to pay FTF a commission (the "**Commission**") of one percent (1.0%) of the gross sales price net of licensing fees, parts purchased and closing costs (including legal fees).  FTF agrees to assist the Company by facilitating the transfer of the Asset(s) in an efficient manner.  Such Commission shall be paid immediately upon the closing of the sale under the corresponding sales contract, however, if the sales price is paid to the Company in installments, the Commission shall be paid to FTF in corresponding installments (on a pro-rata basis).  For the avoidance of doubt, this section does not apply and the Company does not agree to pay FTF such Commission on the sale by the Company of an Asset or Asset(s) to an operator or user pursuant to a purchase option in the relevant lease agreement or training agreement.

4.5     FTF is an independent contractor. Nothing in this Agreement shall be construed as constituting a joint venture or partnership between the parties hereto or as giving one party to this Agreement control over the managerial practices, financial administration or personnel practices, policies or procedures of the other party. As between the Company and FTF, FTF shall have full and exclusive liability for the payment of compensation, workers' compensation and employer's liability insurance premiums with respect to its employees and other personnel retained by it and for the payment of all taxes, contributions and other payments for unemployment compensation or annuities now or hereinafter imposed upon employers by the government of the United States of America or by any individual state, local or foreign authority with respect to such employees and other personnel retained by it. The Company will not provide to FTF or the Individuals, and, as between the Company and FTF, FTF shall be solely responsible for, any liability and other insurance or health insurance and benefits, Social Security and other payroll taxes, unemployment taxes, employee benefits or coverage under any employee benefit plans. FTF also acknowledges and agrees that FTF is solely responsible for any and all compensation of the Individuals.

4.6     FTF acknowledges and agrees that, as between the Company and FTF, FTF is solely responsible for any federal, state or local income, excise or other taxes imposed on FTF or the Individuals as a result of any of the payments provided for under this Servicing Agreement.

5.     **Expenses and Termination**.

5.1     During the Servicing Period, FTF shall (a) maintain its own office space and all equipment necessary to provide the Services hereunder at its own expense and (b) be responsible for the base salaries and benefits of FTF employees, including but not limited to the Individuals, and related general overhead costs.

5.2    The Company must pre-approve any and all expenses, before being incurred by FTF in order for the expenses to be reimbursable by the Company. For the avoidance of doubt, the Company will not reimburse any of FTF's expenses that were not pre-approved by the Company. To the extent that the Company pre-approves the incurrence of expenses or FTF is otherwise expressly authorized to incur such expense under this Agreement, the Company covenants and agrees that it shall pay or reimburse FTF for any and all such out-of-pocket expenses that may be paid or incurred by FTF on behalf of the Company in the performance of its duties hereunder. For all pre-approved expenses, the Company agrees to reimburse FTF within ten (10) business days from receipt of an invoice from FTF with reasonable documentation and support.

5.2.1    In connection with FTF's attendance at certain industry conferences, FTF agrees to facilitate introductions, schedule meetings for the Company and endeavor to identify new business opportunities for the Company. The Company agrees to reimburse FTF for expenses incurred by FTF in connection with FTF's attendance to the following annual industry conferences: (i) WATS, (ii) Paris Air Show / Farnborough, and (iii) EATS.

5.2.2    The Company agrees to reimburse FTF for reasonable and documented pre-approved expenses incurred by FTF for air travel and associated out of pocket expenses for marketing and services performed by the Individuals relating to the Original Simulators and the Toluca Simulators. The Company agrees to reimburse FTF for reasonable and documented pre-approved expenses incurred by local independent contractors periodically onsite in relation to the Toluca Simulators. Notwithstanding the above, the Company will agree to reimburse FTF for non pre-approved but reasonable and documented expenses in the amount up to $350.00 per month for out of pocket expenses relating to the Original Simulators and the Toluca Simulators. Any amount above the monthly amount of $350.00 will need to be pre-approved as set forth above.

5.3    Regarding New Simulators, the Company agrees to reimburse FTF for reasonable and documented pre-approved expenses incurred through the performance of services by FTF relating to the acquisition and future leasing of New Simulators pursuant to the following:

5.3.1    Up to an annual amount of $30,000.00 of pre-approved expenses per section 5.3, the Company agrees to reimburse FTF for such expenses within ten (10) business days from receipt of an invoice from FTF with reasonable documentation and support.

5.3.2 For pre-approved expenses per section 5.3 in excess of an annual amount of $30,000.00, the Company agrees to reimburse FTF for such expenses once (i) the Company has consummated the transaction (ii) the Asset is certified ready for training and (iii) the Asset is operating under a lease or training agreement.

5.3.3 Notwithstanding anything in this section 5.3, for any and all expenses reimbursed to FTF by the Company for prospective transactions that the Company decides not to consummate, FTF acknowledges and agrees that, in the event FTF engages with another investor pursuant to section 7.3, FTF will ensure that any and all expenses for such prospective transaction that had been reimbursed by the Company will subsequently be reimbursed to the Company by the other investor consummating such transaction.

5.4 Notwithstanding the foregoing, the Company shall be responsible for all third-party costs in connection with Asset acquisitions and the standard operating expenses relating to such Assets, provided that the Company shall have entered into an agreement directly with such third-party for such products and/or services. FTF will immediately notify the Company of any expenses relating to the Assets as soon as FTF becomes aware of such expenses which may be required. FTF acknowledges and agrees that it will not contract with any third-party to incur expenses on behalf of the Company without the explicit written pre-approval of the Company.

5.5 The Company and FTF may terminate this Servicing Agreement for Cause (as defined below) prior to the end of the Servicing Period. For purposes of this Servicing Agreement, "**Cause**" shall mean (a) a material breach by FTF or any of the Individuals or the Company, of any of the terms of this Servicing Agreement, which FTF or the Individual has failed to cure (to the extent curable) such breach to the reasonable satisfaction of the other Party within thirty (30) days after receipt of written notice, specifying such breach; (b) engagement by FTF or any Individual or the Company in any act(s) of gross negligence or willful misconduct within the scope of the Services as determined by the other Party in good faith, which FTF or the Individual or the Company, as applicable, has failed to cure (to the extent curable) such act or acts to the reasonable satisfaction of the other Party within thirty (30) days after receipt of written notice, specifying such act or acts; (c) if FTF or any Individual or the Company has been subject to indictment for, or convicted of, or made a plea of guilty or nolo contenders to, a felony involving fraud, theft, misappropriation, dishonesty, embezzlement or any other felony involving moral turpitude, or the willful commission of any other act or omission involving dishonesty or fraud; (d) if any act or omission by FTF or an Individual results in the termination of, or any material adverse modification to, any relationship that the Company has with a third party; or (e) if FTF or any Individual substantially, on more than one occasion, refused to perform

8

his or her material duties as determined by the Company in good faith and failed to cure (to the extent curable) such failure to perform to the reasonable satisfaction of the other Party within thirty (30) days after receipt of written notice, specifying such failure to perform.

5.6    In the event that this Servicing Agreement is terminated prior to the end of the Servicing Period, FTF (a) shall be entitled to a pro rata portion of (i) the Monthly Fee set forth in Section 4.1 based upon the number of days during which Services were provided during the month in which such termination occurs, (ii) any Origination Fee, as set forth in Sections 4.2, 4.3 and 4.4 payable as of the date of such termination and (iii) any unpaid approved expenses as set forth in Sections 5.2 and 5.3 and (b) shall be entitled to no other payments or benefits hereunder.

5.7    Upon the expiration or termination of this Servicing Agreement in accordance with Section 5.5 or 5.8, FTF shall promptly return to the Company (or its designee) the originals (and all copies) within its possession of all agreements, contracts, instruments and other documents relating to the Assets and shall provide the Company (or its designee) with such other information relating to the Assets as shall be reasonably requested and shall undertake all other appropriate steps. In the event that this Servicing Agreement is terminated pursuant to Section 5.5 or 5.8, FTF shall continue managing the Assets and performing the Services for a period of up to thirty (30) days (or such shorter period as the Company may determine) (such period, the "**Transition Period**") after such expiration or termination, in order to properly transition the management and performance thereof to the Company or a replacement manager designated by the Company. During the Transition Period, FTF shall take all commercially reasonable actions necessary or advisable or as reasonably requested by the Company to properly transition the management of the Assets and the performance of the Services.

5.8    In the event of the death or disability of Pedro Sors, the Company may elect in its sole discretion to terminate this Servicing Agreement.  In the event that the Company elects to terminate this Servicing Agreement, FTF (a) shall be entitled to a pro rata portion of (i) the Monthly Fee set forth in Section 4.1 based upon the number of days during which Services were provided during the month in which such termination occurs, (ii) any Origination Fee, as set forth in Sections 4.2, 4.3 and 4.4 payable as of the date of such termination and (iii) any unpaid approved expenses as set forth in Sections 5.2 and 5.3 and (b) shall be entitled to no other payments or benefits hereunder.

6.    **Confidentiality**.

6.1    For purposes of this Servicing Agreement, "**Confidential Information**" shall include but not be limited to all proprietary and/or confidential knowledge and information owned, developed or possessed by the Company

or any of its affiliates, whether in tangible or intangible form, pertaining to the business of the Company or any of its affiliates, including but not limited to: inventions, designs, methods, systems, improvements, trade secrets, business information, terms and conditions of the lease, purchase contracts and licenses pertaining to the Assets, financial information, disclosed prospective customers, identities or individual contacts of business entities which are customers or disclosed prospective customers of the Company, pricing considerations relevant to the Assets, and maintenance and servicing information of the Assets, whether developed prior to the date of this Servicing Agreement or hereafter, and made known to FTF, whether or not developed, devised, or otherwise created in whole or in part by FTF's efforts by reason of FTF's engagement to the Company.  Confidential Information will remain the exclusive property of the Company.

6.2    Notwithstanding the foregoing, the disclosure of any Confidential Information will be permissible in the following cases: (a) if the same is or becomes available to the public generally other than through any act or omission on FTF's part, (b) if the Confidential Information was independently developed by FTF or the Individuals prior to November 23, 2010 or (c) if FTF receives information from a third party free to make such disclosure without breach of any legal obligation, however, that in any and all cases Confidential Information shall include the terms and conditions of the leases, the purchase contracts and the licenses pertaining to the Assets.

6.3    During and after the Servicing Period, FTF agrees that it will maintain Confidential Information, for all purposes, in strict confidence and shall use the Confidential Information only for a purpose authorized under this Servicing Agreement. During and after the Servicing Period, FTF agrees that it will not (a) use or disclose any Confidential Information in contravention of the Company's policies or procedures made known to FTF; (b) use or disclose any Confidential Information in contravention of any lawful instruction or directive, either written or oral, of any Company employee; (c) use or disclose any Confidential Information in contravention of any duty existing under law or contract; (d) use or disclose any Confidential Information to the detriment of the Company; (e) use or disclose any Confidential Information to any third party without the express written consent of the Company; (f) use or disclose any Confidential Information for a purpose other than for which FTF is authorized under this Servicing Agreement; or (g) otherwise take any action inconsistent with the Company's measures to protect its interests in the Confidential Information, or any action which could constitute or facilitate the unauthorized use or disclosure of Confidential Information.

6.4    FTF acknowledges and agrees that (a) the Confidential Information is commercially and competitively valuable to the Company and vital to the success of the Company's business; (b) the unauthorized disclosure of any Confidential Information would cause irreparable harm to the Company; (c)

the obligations of FTF that are set forth in this Servicing Agreement are necessary to protect the Company's legitimate interest in its Confidential Information; (d) the remedy at law for any breach by FTF of the terms of this Servicing Agreement will be inadequate and that, accordingly, in addition to any remedies the Company may have at law, the Company will be entitled to apply for and obtain equitable relief in any court of competent jurisdiction to restrain the breach or threatened breach of, or otherwise to specifically enforce, such terms. Furthermore, FTF acknowledges and agrees that FTF is not expected to and should not disclose to the Company any proprietary, confidential or trade secret information received from third parties, including without limitation, any of FTF's former employers or clients.

6.5     In the event that FTF is requested pursuant to, or required by, applicable law or regulation or by legal process to disclose any Confidential Information, provided that FTF shall have provided the Company with prompt notice of such request(s) so as to enable the Company to seek an appropriate protective order and, further provided that, in the event that such protective order or other remedy is not obtained within the time in which FTF is required to so disclose, FTF agrees to (a) furnish only that portion of the Confidential Information which, in the opinion of counsel, it is legally compelled to disclose, (b) agrees to use reasonable efforts to obtain assurance that if possible, confidential treatment will be accorded the Confidential Information, and (c) such disclosure is made to professional advisors of FTF for the purpose of obtaining any advice thereon.

6.6     Promptly upon the termination or expiration of this Servicing Agreement, all such property, materials and information, in any medium whatsoever, will be immediately returned to the Company. In addition, FTF agrees that such information will not be reproduced and will not be directly or indirectly disclosed or transferred by FTF to any third party without prior written approval by the Company. FTF agrees not to use or disclose any Confidential Information knowingly to the detriment of the Company.

6.7     FTF acknowledges and agrees that FTF will be responsible for any breach of this Section 6 by the Individuals, or any employee(s) or other person(s) approved by the Company to perform the Services on behalf of FTF. FTF further acknowledges that breach of these confidentiality obligations will be cause for immediate termination of this Agreement, and that in such an event, FTF will be liable for any damages caused to the Company by reason of such disclosure, including reasonable attorney's fees.

7.    **Relationship between FTF and the Company.**

7.1     FTF is an independent contractor and not an employee or agent of the Company. FTF will not take any action or sign any agreement or enter into

any commitment on behalf of the Company and will not represent, at any time, that it has the power to bind the Company.

7.2   FTF will not disclose to any third party, except their respective legal counsel and accountants, the terms of this Servicing Agreement.

7.3   Subject to Section 8 below, nothing in this Servicing Agreement shall preclude FTF from entering into similar servicing agreements with other customers or clients. This Servicing Agreement shall not be construed as an exclusive arrangement. Notwithstanding the above or any other term contained herein, the Company shall be given reasonable advance written notice (the "Deal Notice") by FTF of all new flight training deals or proposed Asset acquisitions in which FTF has identified and such Deal Notice shall set forth a description of the material terms and conditions of any such new flight training deal or Asset acquisition (including, if applicable, but not limited to type of flight training device, manufacturer, certification level, price, financing and relevant financing details, location, tax jurisdiction, customer(s), term of lease, guaranteed hours, additional hours, rate, fixed purchase option, timing of ready for training). Upon receipt of a Deal Notice, the Company shall have 15 days to evaluate the new investment opportunity. If within such 15-day period the Company elects to participate or invest in the proposed transaction, then FTF shall be required to allow the Company to participate or invest in such transaction and FTF and the Company shall agree on terms in connection therewith. If within such 15-day period the Company elects not to participate or invest in the proposed transaction, then FTF shall be allowed to offer such proposed transaction to other investors on the same terms and conditions set forth in the applicable Deal Notice. In the event that the Company has not made any election within the 15 day period and FTF wishes to offer such proposed transaction to other investors, then FTF shall notify the Company in writing (the "Follow Up Notice") of its intent to proceed with the proposed transaction and the Company shall then have an additional seven (7) days from the date of receipt of such Follow Up Notice to exercise its right to participate. If within such 7-day period the Company elects to participate or invest in the proposed transaction, then FTF shall be required to allow the Company to participate or invest in such transaction and FTF and the Company shall agree on terms in connection therewith. If within such 7-day period the Company elects not to invest in the proposed transaction or if the Company has not made any election within such 7-day period, then FTF shall be allowed to offer such proposed transaction to other investors on the same terms and conditions set forth in the applicable Deal Notice. Notwithstanding anything to the contrary set forth in this section, if at any time after receipt of a Deal Notice by the Company any material term or condition of the proposed transaction or opportunity described in such Deal Notice is modified, then FTF shall provide the Company with a new Deal Notice setting forth such modified terms and conditions, at which time the evaluation process and initial 15-day period described above shall re-start.

7.4    For avoidance of doubt, Section 7.3 shall not apply to any and all deals relating to Training Center(s) in India owned and operated by International Flight Training Institute of India, Private Limited ("**IFTI**""). FTF shall not be required to allow the Company to participate or invest in any transaction or new deal relating to the IFTI Training Center(s) in India provided that the Company is not asked to shoulder any expenses relating to the diligence or execution of such transaction(s) for IFTI. FTF hereby agrees that the activities described in this section 7.4 for IFTI shall not interfere with their performance of its responsibilities for the Company under this Agreement.

8.    **Certain Covenants, Representations and Warranties.**

8.1    Notwithstanding Section 7.3 above, FTF represents and warrants that it will not enter into an agreement, or be a party to any other arrangement, that will prevent FTF from fully performing its obligations under this Servicing Agreement. FTF represents and warrants that no work performed by it hereunder will infringe or violate the proprietary or intellectual property rights of any third party, except to the extent that the work consists exclusively of materials or information provided to FTF by the Company.

8.2    FTF represents and warrants that all work it performs pursuant to this Servicing Agreement will be performed with a professional level of skill and will conform to the instructions and specifications set forth herein.

8.3    During the Servicing Period, FTF agrees to comply with all material written policies of the Company that are disclosed to FTF from time to time.

8.4    FTF shall not, during the Servicing Period or any time thereafter, interfere with or disrupt, or attempt to interfere with or disrupt, any relationship, contractual or otherwise, between (i) the Company or any subsidiary or affiliate thereof and (ii) any actual or potential customer, client, supplier, contact or other business relation of the Company or any subsidiary or affiliate thereof (such persons shall be collectively referred to as the "**Restricted Persons**"), including, without limitation, making any negative or disparaging statements or communications regarding the Company or any subsidiary or affiliate thereof (which shall include the officers, directors, employees, capital providers (current or potential), agents and direct or indirect owners of the Company and its subsidiaries and affiliates) either publicly, to any Restricted Person or in any manner reasonably likely to embarrass or otherwise damage or disparage such person.

9.    **Miscellaneous.**

9.1    All notices under this Servicing Agreement must be in writing and must be sent by hand delivery, overnight delivery service or certified or registered

13

mail, or by e-mail (promptly confirmed by dispatching the hard copy by hand delivery, overnight delivery service or certified or registered mail) to the address of the applicable party set forth below (or as otherwise notified by such party). Notices will be deemed given upon receipt or, in the case of notice by facsimile, upon telephonic confirmation or receipt of the appropriate number of pages and dispatch of the hard copy.

| **If to the Company, to:** | **If to FTF, to:** |
|---|---|

**If to the Company, to:**

Aviation Holdings I, LP
c/o BlackRock
55 E. 52nd Street, 6th Floor
New York, NY 10055
Attention: Joshua Tarnow
Fax: (646) 310-9334

With a copy to:
BlackRock
Office of the General Counsel
40 East 52nd Street
New York, NY 10055
Attention: David Maryles and Vincent Taurassi
Fax: (212) 810-5116

**If to FTF, to:**

Flight Training Finance, LLC
1221 Brickell Avenue, 9th Floor
Miami, Florida 33131

With a copy to Pedro Sors
2000 S. Bayshore Drive, Unit #6
Miami, FL  33131
Email: pedrosors@ftfsim.com
Fax: (305) 856-9999

With a copy to:
John Pincavage
3 Nutcracker Lane
Westport, CT  06880
Fax: (203) 226-0351

With a copy to:
Elsa Gagnon
1055 NE 96th Street
Miami, Shores, FL  33138
Email: elsagagnon@ftfsim.com

These addresses may be changed by written notice to the other parties, provided that no notice of a change of address shall be effective until the actual receipt of such notice.

9.2    Neither the rights nor the obligations under this Servicing Agreement may be assigned or delegated by either party, except that (i) the Company may assign this Servicing Agreement to a transferee of an Asset or Assets owned by the Company or its affiliates and (ii) the Company may assign any of its rights or delegate any of its obligations hereunder to any of its affiliates (provided, however, in the event of such an assignment by the Company to an affiliate, the Company shall remain liable for any payments or obligations under this Servicing Agreement).   Any purported assignment that is not expressly permitted by this Section 9.2 shall be void *ab initio*.

9.3    It is expressly agreed that (a) the Company shall have no responsibility, liability or obligation for, in respect of or otherwise in connection with the classification of FTF as an independent contractor, including with respect to any penalties, fines, fees or taxes resulting from the under withholding of any employment-related taxes, and (b) FTF hereby indemnifies and holds the Company harmless from any losses, claims, damages or liabilities, including reasonable legal fees and expenses, that the Company may suffer or incur pursuant to or in connection with the classification of FTF as an independent

15

contractor including any failure of FTF to be classified for any purpose as an independent contractor.

9.4    FTF hereby indemnifies and agrees to hold the Company and its affiliates (and their officers, directors, employees and agents) harmless from and against any loss, liability, damage, cost or expense (including, without limitation, reasonable attorneys' fees and expenses) suffered or incurred by any of them and arising out of (a) FTF's gross negligence or willful misconduct; (b) FTF's infringement or violation of the proprietary or intellectual property rights of any third party; or (c) FTF's breach of any of the terms of this Agreement. The Company hereby indemnifies and agrees to hold FTF and the Individuals harmless from any loss, liability, damage, cost or expense (including, without limitation, reasonable attorneys' fees and expenses) resulting from any claims made by any third party against FTF or the Individuals in connection with the execution and performance of the Services hereunder other than as result from (i) FTF's or an Individual's gross negligence or willful misconduct; (ii) FTF's or an Individual's infringement or violation of the proprietary or intellectual property rights of any third party; or (iii) FTF's or an Individual's breach of any of the terms of this Agreement.

9.5    The terms of this Servicing Agreement are subject in all respects to the terms of the operating agreement of the Company as in effect from time to time, which are incorporated herein by reference.

9.6    This Servicing Agreement may be modified, superseded, canceled, renewed or extended, and the terms hereof may be waived, only by a written agreement executed by all of the parties hereto, or in the case of waiver, by the party waiving compliance. No course of dealing, course of performance or failure of any party to strictly enforce any term, right or condition of this Servicing Agreement shall be construed as a waiver of any term, right or condition.

9.7    If any term of this Servicing Agreement or the application thereof is found invalid, illegal or unenforceable, the remainder of this Servicing Agreement will remain in full force and effect.

9.8    This Servicing Agreement sets forth the entire understanding of the parties with respect to its subject matter and supersedes any and all prior agreements, arrangements and understandings relating to the subject matter hereof. Headings are for convenience only and are not to be used to interpret this Servicing Agreement.

9.9    The Servicing Agreement is being delivered in and shall be governed by and construed and enforced in accordance with the laws of the State of New York, without giving effect to conflict of laws principles thereof. The parties hereby consent to the sole and exclusive jurisdiction of the courts of the State

of New York located in New York County or the United States District Court for the Southern District of New York, for purposes of any action or proceeding brought on or in connection with this Servicing Agreement or any alleged breach thereof.

9.10   This Servicing Agreement may be executed in counterparts each of which when so executed and delivered shall constitute an original, but all such counterparts shall together constitute but one and the same instrument.

**IN WITNESS WHEREOF,** the undersigned have executed and delivered this Servicing Agreement as of the date first set forth above.

**AVIATION HOLDINGS I, LP**                    **FLIGHT TRAINING FINANCE, LLC**

By: Aviation Holdings GenPar, LLC, its
general partner

By: BlackRock Investment Management,
LLC, its managing member

By: _____              By: _____
    Name: Joshua Tarnow                             Name:
    Title: Managing Director                        Title:

**IN WITNESS WHEREOF,** the undersigned have executed and delivered this Servicing Agreement as of the date first set forth above.

**AVIATION HOLDINGS I, LP**                    **FLIGHT TRAINING FINANCE, LLC**

By: Aviation Holdings GenPar, LLC, its
general partner

By: BlackRock Investment Management,
LLC, its managing member

By: _____          By: _____
    Name:                                               Name: PEDRO SOUS
    Title:                                                  Title: PRESIDENT.

18